Good morning. May it please the court. I'm David Menninger. I'm counsel for appellant Daniel Rivera. And unless the court would prefer otherwise, the counsel for Biddles, my colleague Elisabelle and I have decided the argument thusly. I would first like to briefly address the due process violation and Mr. Rivera's removal proceeding. Then, I would like to argue the main issue that the two cases have in common, which is whether the new definition of extortion in both the career offender guideline and the illegal reentry guideline, which abrogated this court's decision in Becero-Lopez, should be applied to cases on appeal. Wait, how can you say it abrogated Becero-Lopez? Because, I should say, Your Honor, it rendered Becero-Lopez no longer good law going forward because it undermined the foundation of that decision. As the district court held in United States v. Nichols and as the government has essentially conceded in both of these cases. So in both of these cases, the government has not argued that under the new definition of extortion, Becero-Lopez is still good law. They have not made that argument. So the only question is whether that change, the new definition of extortion, is clarifying or substantive. And then finally, my colleague Elisabelle will address any other issues in the Bittles case. Turning to the due process violation, Daniel Rivera had a viable way of avoiding being deported back to the country where he had been tortured as a child. There's no dispute on that issue there. It was not contested below or on appeal. The only question is whether the immigration judge fully complied with her obligations to accurately and carefully explore those options with him. And context is critical here. Mr. Rivera had an asylum application that had been pending for five years, a delay that has not to this day been explained. He was in detention and he was unrepresented. In that context, it was misleading for the immigration judge to indicate that he would have to file another application for asylum, because it implied that he would have to restart the process from the beginning, and it implied another lengthy delay. Moreover, at the end of the hearing, he changed course and asked the judge, what can I do to stay in the country? The judge did not tell him what he could do. The judge said, you have to stay in Guatemala. And this court has made clear that an immigration judge has the obligation to fully explore with a respondent appearing before her all options for relief. And that is just as true at the beginning of the hearing as at the end of the hearing. At the end of the hearing, he made clear he did not want to accept deportation. You know, he decided to appeal the decision. The judge said, do you want to accept this decision or appeal? And he said he wanted to appeal. To anyone who's familiar with the immigration court process, that decision made no sense because there was nothing for him to appeal. And the immigration judge knew that. But the immigration judge did not give him an opportunity, now that at the end of the hearing, to apply for the relief that very well could have saved him from being deported back to Guatemala. Briefly then turning to the issue regarding the guidelines and whether the change was clarifying. Do we need to get to that question in Rivera if we decide that the 2002 deportation was not fundamentally fair? No, if you agree with me on that first argument, Your Honor, his conviction would have to be reversed so we would not have to address the sentencing issues. So the sentencing issues would only be if this court agrees that the removal proceeding was fundamentally fair. So briefly, if the court doesn't have any further questions on that first issue, I'd like to briefly address the clarifying versus substantive argument. The only difference between the change in Morgan that this court found clarifying and the new definition of extortion that's at issue here is that in Morgan there was a circuit split. So Morgan laid out a list of nonexhaustive indicators of what might make a change clarifying or substantive. In Morgan itself, the change in Morgan itself did not meet the first or the second of those factors. And then the court said, look, there's a circuit split. And it cited to a Seventh Circuit decision that said when the guidelines change resolves an ambiguity in the original definition of the guideline, it's clarifying. And Morgan said when there's a circuit split on the issue, that's a key indicator that it's merely resolving an individual issue. An already existing ambiguity in the guideline. Now, we can see there was no circuit split in this case, but Morgan did not say that, you know, the black and white ticking of the boxes as to which courts have decided each way of the issue was dispositive. And again, they relied heavily on the Seventh Circuit decision in Hartz, which phrased it broadly as to whether the change resolved an ambiguity in the original definition of the guideline. Here we have a term extortion that was entirely undefined up until this change. And it's a term that does not necessarily have a set definition. In fact, federal law defines it in different ways. The Hobbs Act definition that the court Ambassador Lopez chose included threats to property. But, for example, the federal three strikes law in its definition of what constitutes a violent felony contains a definition that limits, that is limited to injury to persons, much like the new definition that the commission has decided. These are both reasonable interpretations of the term extortion. And when the guidelines, when the commission merely chooses between reasonable interpretations, that is a clarifying choice. And so, again, the Seventh Circuit decision in Hartz, which phrased it broadly as to whether courts have decided each way of the issue was dispositive of any change. If there are no questions on those two points, I'll cede to my colleague, Your Honor. Good morning, Your Honors. May it please the Court, Elissa Bell on behalf of Appellant Tony Bittles. And we did want to reserve two minutes for rebuttal. Your Honors, there is a simple and a straightforward resolution of this case, and that is a remand for resentencing due to the court's procedural error in failing to address defense counsel's specific and non-frivolous argument that the guideline applied was unsound. And this puts this case on all fours with Henderson. There the issue was a policy, a Kimbrough-based policy disagreement with the child pornography guideline. And the district court stated essentially that it would await guidance from the Ninth Circuit and made no specific ruling on that Kimbrough-based request for a rejection of the child pornography guideline. And here defense counsel made another specific non-frivolous policy argument that the guideline applied was unsound. Defense counsel explained that the commission was amending the guidelines and amending the definition of extortion, specifically to exclude offenses such as 211, which include non-violent threats to property. And it was doing so because courts had strayed from the intended purpose of the career offender guideline, which was to focus on the most dangerous and repeat offenders. Now counsel explained this and the court stated essentially, I have no intention of reading into the future. I have a difficult enough time understanding what is happening today. And that was insufficient for meaningful appellate review. And a remand is required on this basis. The error was not harmless, as the government claims, because it did result in a guideline that, in a sentence that was three times the low end of the otherwise applicable range. And this is in light of Mr. Biddle's serving a significant state sentence of nine years for this offense, and the court ordering a consecutive sentence. Now there is another procedural error that requires remand in this case, and that is the court's failure to correctly calculate the guidelines by determining that 211 was a crime of violence. And I'd like to first address the threshold question, which is what is the legal landscape that this court is confronting in the wake of Johnson and in light of Beckles? Now the government asks this court to sidestep Johnson entirely, and to rely on pre-Johnson precedent in Prince, which relied on the residual clause. And that is wrong for two reasons. One is that this court should not rely on the residual clause, and this court should not rely upon it now. And the second is the government is wrong. We would urge this court to follow Judge Ikuda's dissent in Lee, because Judge Ikuda was prescient in predicting the outcome in Beckles. She found that constitutional vagueness principles do not apply to the advisory guidelines, and then provided a roadmap of how to understand the effect of Johnson under those circumstances. And she first describes the dual effects of Johnson. One, Johnson explains that deriving any meaning from the residual clause is a failed enterprise. The residual clause is inscrutable, and Beckles did not retreat from that assessment whatsoever. And second, Johnson expressly overruled the Supreme Court's precedent interpreting the residual clause. It overruled Begay and James and Sipes and Chambers. And in so doing, it also specifically overruled application of the ordinary case test. So there no longer is a test in this circuit for application of the residual clause. And with these principles in mind, she concluded that Johnson, quote, so undermines the residual clause that it cannot be accurately interpreted, and therefore, quote, a district court would commit procedural error and abuse its discretion if it used the guidelines residual clause to calculate the guidelines range. And this is why the government's simple citation to Prince cannot be the end of the inquiry. Prince was a residual clause case that specifically cites James and Begay, which are no longer good law, and applies the ordinary case test, which is no longer the operative test. And if the court has no questions about the residual clause, I did want to address the commentary argument and the effect that Beckles has upon Mr., I'm sorry, that Beckles has upon Mr. Vittle's commentary argument. And the simple and straightforward statement is the commentary is not entitled to deference under Seminole Rock because it no longer interprets a textual provision. And I'll explain that step by step. The legal framework is set out in Stinson, which explains that only commentary that interprets or explains a guideline is authoritative or entitled to deference. And in this case, just as a brief reminder, since the guideline is different than that at issue in Mr. Rivera's case, robbery appears only in the commentary.  The guideline has a force clause, a list of enumerated offenses that do not include robbery, and a residual clause, and robbery appears in Application Note 1. Robbery could not be interpreting the textual provision of the force clause, as this court has found time and again, under Dixon, for example, which specifically held that 211 does not satisfy the force clause. Nor could robbery be interpreting one of the enumerated offenses. It plainly makes no sense to say that robbery interprets use of explosive, for example. And finally, robbery cannot be interpreting the residual clause after Johnson because Johnson states in no uncertain terms that the residual clause is inscrutable. And so the commission's simple pronouncement that the residual clause means this or that is not entitled to deference. You have two minutes left if you wanted to save them for rebuttal. We'd be happy to, Your Honor. Good morning, Your Honors. May it please the Court. My name is Ashley All for the United States. Very little of these cases is left after Beckles and this week's decision in Chavez-Cuevas, which resolved the core common issue of whether California robbery, Penal Code 211, is categorically a crime of violence under the enumerated offenses clause of the pre-2016 guidelines. So I'll turn to the narrow issues that counsel has just discussed that I think are left. The first is the retroactivity of the 2016 Guidelines Amendments 798 and 802. I'll then talk briefly about the procedural error claim and then the 1326D challenge. On retroactivity, the amendment to the definition of extortion, which appears in Amendment 798 of the Guidelines, is not retroactive under any of the principles articulated in Morgan. Notably, Morgan and Quintero-Leyva and Van Alstyne and Catalan, all of these cases that found amendments retroactively applicable, they all identified circuit splits, and there's no dispute that there's no circuit split here. But the Court need not rest on that narrow ground. Reading Amendment 798, in my view, it is clear that what the Commission did was it engaged in a long notice and comment process, it took data, and it sought to narrow, that was the Commission's word, the definition of extortion to cover a smaller set of crimes than had universally been covered by that definition before. That is not a clarifying amendment. That is a change. And I think it's particularly clear with respect to 2L in Mr. Rivera's case. In 2L, the Amendment 802, which amends 2L and adopts the extortion definition from 798, doesn't even apply crime of violence to felonies anymore. It's a ground-up rejiggering of that entire guideline. And so the crime of violence definition and the enumerated offense extortion only applies to misdemeanors now. It wouldn't apply to Mr. Rivera's conviction at all, which would be analyzed under a completely different rubric under the new guideline. And so to say that this new definition of extortion that doesn't apply to felonies at all under 2L retroactively applies to his felony under an old version of 2L, I would submit is one bridge too far. On the claim of procedural error, Mr. Biddle's original claim was that the enumerated offenses no longer could be applied because they were, quote, vestigial after what they anticipated Beckles would hold, which is that the residual clause of 4B was unconstitutionally vague. Beckles, of course, did not come out that way. The residual clause is not unconstitutionally vague. And to the extent that defendant has now attempted to pivot and rely on the dissent in Lee, that claim would be subject to plain error, first of all. There's no controlling authority holding what defendant now argues. And, moreover, ultimately, this case does not depend upon the residual clause. This case depends upon the enumerated offenses clause. And Becerra-Lopez holds in 2L and Harris holds in 4B that those enumerated offenses independently would control this case. Under Harris and under Becerra-Lopez, you cannot avoid the 211 is categorically a crime of violence under the pre-2016 guidelines. And finally, on the 1326D claims, under any standard of review, though I submit that the law is clear, it should be clear error, there was no violation of due process here. Taking a step back and looking at how this Court analyzes due process violations. Kagan. Are you talking about Rivera now? Yes. And you're talking about its due process claim with respect to the deportation proceedings? Yes, Your Honor. I'm really concerned about that because I read the transcript carefully. I haven't yet listened to it. I'm planning to listen to it also. But just from reading the transcript, it seemed to me that she, that I.J., I don't know if it's a man or a woman, did not let Rivera tell her that he had a pending asylum claim. And to me, the way, you know, reading the transcript, it looks as though she had not kept cutting him off. She would have had the basic information that he had an asylum claim pending, that had been pending for six years, and then she could have properly advised him. She could have adjudicated that claim right then and there. And she didn't. So it's almost like she didn't even do the predicate work to allow herself to be able to give him the proper advisals. Yeah. Now, why isn't that a violation of due process? So I absolutely understand that concern. I read the record slightly differently. And I, likewise, have read it multiple times and listened to it to try to get a sense of what actually was going on here. What's notable in my view is she starts going through what she has to ask him. And when this Court has analyzed these due process violations in deportation proceedings, it's really tied to the CFR provisions that require I.J.'s to advise, to figure out whether he's eligible. Yeah. And my fundamental question is, how could she advise when she wouldn't let him talk, so she didn't have the basic information? So in my view, she did. So her first question to him was just a factual question. Her first question to him was just, do you fear returning to the country of Guatemala based on particular factors, and do you fear returning for any of these reasons? And notably, in my view, the defendant immediately knew what she was talking about. That was just a factual question. But he said, yes, Your Honor, but I don't want to. I'm afraid to go back there, but I don't want to get that. I just want to get deported right now. So from the very outset, as she's complying with the CFR requirements that she figure out the factual basis for a possible form of relief, he's knowing what she's talking about and saying, I don't want that. Like, I'm afraid, but I don't want that. And she does it again. She doesn't stop her advisement. I think this would be a much harder case if after that first denial she had stopped and said, well, you said you didn't want it, and so I'm not going to keep advising you. But she kept asking the factual predicates, not only first for withholding of removal, then for CAT. She kept repeatedly asking him these factual questions, and he repeatedly said not all he said, yeah, but I don't want to. I don't want to. It was only several. Kennedy But the problem is, this was in the context of his having already spent five years waiting for that decision, and he asked, can I get a lower bail? He obviously didn't want to go to Guatemala. He could tell at the beginning, at the end, but he also didn't want to stay and start all over again and wait another five years in detention. And there was clearly, there was confusion about what had happened to his application. He thought he had an application, and as far as I know, he did, which has never been ruled on. So I think there are two answers to that question. One is more doctrinal, and one is more factual. The more doctrinal answer is that the I.G. was doing exactly what this Court has repeatedly said an I.G. has to do, which is go through the advisements under the CFR provisions. She was doing exactly that. And I understand the concern that he had this thing pending, but when he told her that, she said, she asked him if he wanted to file another application, which as we put in the room. Another one. Which as we put in the room. What happened to the first one? The first one was still pending at that point. It's still pending? What did that mean to him? Do you want to file another one instead of the one he already had pending? What was he supposed to think about that he had to file another one? Yeah, as a matter of fact, it is accurate that he would have had to file in that moment another one in order, and then it would have been set for a new hearing. No doubt they could have gotten their hands on the other application. I'm sure that's correct. I don't think he would have had to file. He had a pending application, but the government lost it. Why would he have to file another one? So there is a hint in the record as to what was going on that I only discovered in prepping for argument at ER 195 when he ultimately did get notice of a hearing in 2005, long after this. There's a reference in that notice to him being a potential, what's called ABC class member. I looked into this just out of Thornburg, which was a class action settlement regarding a whole host of asylum claims out of Guatemala. The government was overwhelmed with asylum claims from Guatemalans during the Civil War for understandable reasons, many of which were denied summarily or held for long periods of time. When he ultimately did get his interview or a notice of an interview in 2005, there was a reference to that, but I admit that's the only thing in the record explaining why there was a long delay between his filing and ultimately getting an interview. And then there was a notice of an interview in 2005 and nothing happened after that. But how was this man to understand what his choices were? He asked if he could get lower bail. I mean, he spent, was it five years in detention? No, he was not in detention for five years. How long was he in detention? I apologize. I don't know the answer to that question. He was released from He was not in detention for five years. His application was pending for five years. His application was filed in 1996, and he was free after that period. That's how he committed a robbery in 2000. And then after 2000, when he was released from prison, that is when he went into deportation proceedings. But he was in custody. How long had he been in custody? I don't know the answer to that question. Yeah, and he asked if, well, the first question was when they said, do you want to start, whatever, he asked, could he get out of custody? Can I get a lower bail? Apparently not. But how did he, was he to understand what was happening to him? Don't you think he should have been told, look, you had an application. We can't act on that. You can file another one. Here's when we'll have a hearing. All he said is, I'm tired of sitting in custody. I'll go back to Guatemala rather than just sit in custody. And that, I thought it came across pretty clearly in what he was saying. And particularly when he said at the end, I want to appeal it. He was certainly confused. And I don't think we hold the I.J. or anyone else to too high a standard, but it does seem to me that at least someone's entitled to know what's going on in this case. So my only potential retort to that, Your Honor, is that in holding I.J.'s to a I think it's 1240.11, which says what an I.J. has to do to advise aliens of their potential eligibility for relief. This applies in a number of contexts, but if you get the factual basis, you have to find out whether they do have a viable claim for voluntary departure, or in this case, cat, or whatever it is, and then advise them of their potential eligibility based on that factual record. And it really can't be said that the I.J. didn't do that here. She did do that here. He just kept saying he wasn't interested. And while I agree with the Court that the record on what exactly he wanted to accomplish, particularly in light of his ultimate reservation of the right to appeal, is muddied, I can't say that what happened is fundamentally unfair from the perspective of the I.J., who did exactly what this Court has repeatedly said the I.J. is supposed  No, that reminds me of the problem we have when deciding to reverse a district judge. We don't look at whether the district judge had a reason for making a mistake. You look at what's the effect on the defender, who's going to sit in jail. And it's the same thing here. I'm not blaming the I.J. It's not looking at it from the perspective of the I.J. It's looking at it from the perspective of the person who's going to be deported. The I.J. may have been in perfect good faith, I assume he was, I assume, or she, I don't know. But I assume she tried to follow the rules. And it's not a criticism of the I.J. to say, did the person who's being deported, did he really understand and was he really, was it really explained to him what was going on when he'd had an application pending for five years? And they said, do you want to file another application? And what does that mean to him? Does that mean he's going to wait another five years? I would submit to the Court that that subjective standard just simply isn't the standard this Court has looked at in the past. Well, maybe we ought to improve on our standard. I think the standard as it is is already quite broad in terms of enforcing due process rights in immigration hearings. The Court looks to whether, I mean, the typical case, you have a failure to tell the alien anything about a form of relief to which they're eligible. Certainly that didn't happen here. Or you have a misadvisement that they're not eligible for something that they are. That didn't happen here. And looking at all of the historical cases that have identified due process violations in failures to advise cases, none of them are of the type here where the I.J. did advise him. There can be no dispute that the I.J. did advise him of his eligibility. But he said no. And as Judge Walter found in his findings here, he not just said no once, he said no repeatedly. And it effectively mooted any further inquiry by the I.J. because he was so insistent that he didn't want something. And I can't. We are just about out of time. So let's give you another five minutes to deal with all the other subjects that you want to deal with. Your Honor, unless the Court does have further questions, I'm ready to submit. Okay. Thank you. Thank you. Thank you, Your Honor. I will briefly respond to the government's argument regarding Harris, and then Mr. Menninger can handle any other remaining questions that the Court may have for him. The government is advocating in this case that the commentary have freestanding legal effect, and I wanted to make clear that that presents a separation of powers issue. This Court has explained in Mistretta that the reason that the Sentencing Commission passes constitutional muster is because Congress approves of the text of the guideline, and Congress does not approve of the text of the commentary. And therefore, placing the commentary on par with the text would create the precise separation of powers issue that Mistretta avoided. So the government's avenue is untenable. Thank you. Do you have one minute? You don't have to take it. I'll take it, Your Honor. Thank you. Your Honor, I would just, on the 1326d issue, I would just point out that the government has still not really addressed his change of course at the end of the hearing. And I would submit that under the clear cases that say an I.J. needs to explore avenues of relief, that applies equally to the beginning as to the end of the proceeding, when for the first time he really understood what a removal order, or someone explained to him what a removal order meant. Then I would just briefly like to address the government's arguments regarding the retroactivity of the change in the guidelines. Regarding, the government says if it's narrowing, it can't be clarifying. That's not true. And Quintero Leyva proves that wrong. Quintero Leyva said this has been applied, this amendment, it was about the mitigating role, had been applied too sparingly, and we need to get back to the initial intent. So we need to broaden it. And that's very much what happened here. The commission said we need to get back to the initial intent of focusing on the most violent offenders. So, yes, it was a narrowing, but it was a narrowing change that was used to clarify, Your Honor. Thank you.  Thank you. Thank you, Your Honor. The case is just argued. It will be submitted.
judges: Reinhardt, Fernandez, Wardlaw